**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Roylee Russell MARTIN,**
**Defendant-Appellant.**

No. 84–1369.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 13, 1985.

Decided Oct. 28, 1985.

Designated for Publication Jan. 24, 1986.

Edward P. Moffat, James McGinnis, Asst. U.S. Attys., Fresno, Cal., for plaintiff-appellee.

Gerald R. Lewis, Law Offices of Lewis & Grove, Fresno, Cal., for defendant-appellant.

Before GOODWIN and BRUNETTI, Circuit Judges, and STEPHENS,* District Judge.

BRUNETTI, Circuit Judge:

Roylee Russell Martin was convicted after a court trial of possession of an unregistered firearm and illegal making of a firearm in violation of 26 U.S.C. § 5861. On appeal Martin argues that the district court erroneously denied his motions to suppress certain evidence and statements because (1) he had not received proper *Miranda* warnings; (2) his statements were not voluntary; and (3) his residence was searched and evidence was unlawfully seized without a warrant. We affirm.

FACTS

On July 20, 1983, at approximately 7:00 p.m., the Merced County Police Department received a report of an explosion and an injured person at an apartment complex in the City of Merced. The apartment involved was Martin's residence. Officer Rick Owens arrived at the scene first. Officer Owens did not see the injured person, but observed blood on the sidewalk. He smelled smoke from outside the apartment and, through an uncurtained window, saw dense black smoke inside the apartment and gunpowder on the kitchen table.

Officer Owens knocked on the apartment door, received no response, and then entered the apartment. He saw explosive materials and devices—some marked as property of the National Guard—scattered around the living room and kitchen. Blood, skin, and flesh fragments were visible on the kitchen walls and ceiling. Officer Owens seized the gunpowder and explosive components before leaving the apartment, and then requested help from the National Guard and the police department.

Within fifteen minutes, Captain Gantney of the National Guard and Police Detective Schindler arrived and entered the apartment. Captain Gantney inventoried and took possession of the National Guard property consisting of gunpowder, smoke grenades, flares and M–16 shells. He destroyed any inherently explosive materials. Military personnel trained in explosive device demolition took possession of the remaining explosive components. The apartment was secured.

That evening, Detective Schindler went to the hospital to talk to Martin. Martin had received an injection of Demerol approximately one-half hour before this conversation and appeared groggy and in much pain. Detective Schindler discontinued the conversation. The next day at approximately 10:30 a.m., Detective Schindler returned to the hospital again to question Martin about the explosion. Martin told Schindler that he had been making bombs for the Sandinistas in Nicaragua. That afternoon Alcohol, Tobacco, and Firearms Agent Galyan spoke with Martin at the hospital.

Schindler and Galyan testified that it was apparent Martin was still under the effects of medication: he was groggy but coherent, conducted continuous conversation, and made eye contact. He did not doze off and asked and answered questions. Martin

---

* The Honorable Albert Lee Stephens, Jr., Senior United States District Judge for the Central District of California, sitting by designation.

testified that when he talked to the officers he had received Demerol medication which made him drowsy and that he was in pain. Notwithstanding, Martin agreed that he spoke with each of the officers voluntarily, without pressure or coercion.

## SUPPRESSION OF STATEMENTS

### A. *Miranda* Warnings

■ The questioning of appellant Martin took place at the hospital where he was being treated for injuries sustained in the explosion. Martin contends that because law enforcement personnel failed to advise him of his constitutional rights pursuant to *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), any statements he made should have been suppressed. He argues that he was "in custody" because he was not free to leave the hospital, and that his presence in the hospital was, at least, the functional equivalent of being in custody in that he was deprived of his freedom of action to a significant degree.

The procedural safeguards provided by *Miranda* were designed to protect individuals from police "custodial interrogation." *Id.* at 444, 86 S.Ct. at 1612. The Court in *Miranda* was concerned about the incommunicado interrogation of individuals in a police-dominated atmosphere which elicits self-incriminating information without informing the suspect of his constitutional rights. *Id.* at 445. The Court stated that "[a]n individual swept from familiar surroundings *into police custody,* surrounded by antagonistic forces, and subjected to ... techniques of persuasion ... cannot be otherwise than under compulsion to speak." *Id.* at 461, 86 S.Ct. at 1620 (emphasis added).

In the instant case, before the arrival of any investigative officers at the Martin apartment, Martin and his brother went to the hospital. Medical personnel treated Martin there for several days. There are no facts to indicate law enforcement officials were in any way involved in Martin's hospitalization or did anything to extend Martin's hospital stay and treatment. In such circumstances, the district court correctly found Martin was not "in custody," and that the procedural safeguards outlined in *Miranda* were not required before law enforcement personnel spoke with Martin. The district court properly denied Martin's motion to suppress statements for failure to give the *Miranda* warning.

This is not to say that an individual would never be "in custody" when held for medical treatment in a hospital. If the police took a criminal suspect to the hospital from the scene of a crime, monitored the patient's stay, stationed themselves outside the door, arranged an extended treatment schedule with the doctors, or some combination of these, law enforcement restraint amounting to custody could result. There is nothing in this case to suggest the officers deliberately delayed making a formal arrest in order to avoid compliance with *Miranda.*[1]

### B. Voluntariness

■ Martin contends his statements to police while he was in the hospital were involuntary. He argues that because he was in great pain and under the influence of Demerol, a pain-killing medication, his statements were not the product of his free will and rational choice. Martin cites *Townsend v. Sain,* 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963) and *Mincey v. Arizona,* 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978) in support of his position.

The facts of both these cases are inapplicable to those of the instant case.[2] In the

---

1. Martin's arrest occurred approximately six months after his release from the hospital, and seemed to have no relationship to the hospitalization.

2. In *Townsend,* a 19-year old heroin addict was arrested while under the influence of heroin. He was moved from police station to police station and run through a line-up over a period of approximately nine hours. During the interrogation process he went into drug withdrawal, was unresponsive to questioning, was injected by a doctor with phenobarbital and hyoscine and given extra phenobarbital tablets to take later to alleviate the withdrawal symptoms. Questioning continued and he gave a full confession.

instant case, Martin was awake and relatively coherent during the questioning at the hospital. He sat up in his bed and spoke freely with Detective Schindler and Agent Galyan. When Martin became too groggy to understand the detective's questions, Detective Schindler terminated the interview. There is no evidence of extended and oppressive questioning. Nor had Martin received excessive quantities or unusual combinations of drugs. Martin's injuries, while painful, did not render him unconscious or comatose. Moreover, Martin said that he wanted to talk to the officers and was not reluctant to tell his story.

The district court properly concluded that "although the defendant was injured and under medical care at the time the statements were made, the type, dosage, and schedule of painkilling narcotic administered to [Martin] was not sufficient to overbear his will to resist the questioning or impair his rational faculties."

■ Martin also challenges the sufficiency of the district court's order. He suggests the district court did not explain its decision on the voluntariness question with the clarity required by *Sims v. Georgia*, 385 U.S. 538, 87 S.Ct. 639, 17 L.Ed.2d 593 (1967). *Sims* requires only that the district court's "conclusion that the confession [was] voluntary ... appear from the record with unmistakable clarity." *Id.* at 544, 87 S.Ct. at 643. No formal findings of fact or written opinion is required. *Id.* The district court's written order in the instant case meets this standard.

## SUPPRESSION OF EVIDENCE—WARRANTLESS ENTRY AND SEARCH

■ Martin acknowledges that the initial warrantless entry of his apartment was justified by exigent circumstances. He contends, however, that once Officer Owens determined that no other people were inside the apartment, no further search should have been conducted. He argues that the detectives then turned to a criminal investigation that was unjustified by the exigencies warranting the initial entry, and that the search of his apartment went beyond the scope allowed by the Supreme Court in *Michigan v. Clifford*, 464 U.S. 287, 104 S.Ct. 641, 78 L.Ed.2d 477 (1984), and *Michigan v. Tyler*, 436 U.S. 499, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978).

The district court found there were exigent circumstances which justified the law enforcement officers' warrantless search of Martin's apartment and seizure of tangible evidence found therein.

First, the officer had received a report of a person bleeding as a result of an explosion. After arriving at the apartment, the officer was unable to get a response from any occupant by knocking on the door. The officer observed smoke through an uncurtained window and could smell smoke while standing outside the apartment. The officer had reason to believe persons in Martin's apartment might be in need of medical or other assistance.

Because the officer saw and smelled smoke, a second basis existed for immediate investigation of the smoke's source. The fact that Martin's apartment was within an apartment complex increased the community interest in investigating the source without delay for fear of further explosions or possible fire in other areas of the apartment complex. These circumstances justify not only the search for injured persons, but also the search to determine the cause of the explosion and to ensure that additional explosions or fire would not occur. *See Michigan v. Clifford*, 464 U.S. at 293–95, 104 S.Ct. at 647 (search to ensure against rekindling of fire; search to preserve evidence from intention-

In *Mincey*, the defendant was in an intensive care unit with a hip wound, damaged sciatic nerve and partial paralysis of his right leg. He had tubes in his throat and nose, a catheter in his bladder, he was hooked up to an i-v unit, and had received various drugs. He could not talk and had to write answers to the officer's questions. He was given a *Miranda* warning by the interrogating officer. In spite of the fact that the defendant asked repeatedly that interrogation stop until he could get a lawyer, the officer questioned him continuously for four hours.

al or accidental destruction); *Michigan v. Tyler*, 436 U.S. at 510, 98 S.Ct. at 1950 (search for continuing dangers such as faulty wiring or defective furnace); *United States v. Urban*, 710 F.2d 276, 278–79 (6th Cir.1983) (search for and removal of potentially explosive chemicals).

In light of the potential danger of additional explosions or fire within the apartment complex, the district court correctly concluded that exigent circumstances remained to justify a continued search. Because the officer thereafter observed the weapons and explosive materials in plain view, the seizure of the evidence was proper. *See United States v. Murry*, 751 F.2d 1528, 1532 (9th Cir.), *cert. denied,* —— U.S. ——, 106 S.Ct. 381, 88 L.Ed.2d 335 (1985).

AFFIRMED.