# United States Court of Appeals
## For the First Circuit

No. 11-2156

UNITED STATES OF AMERICA,

Appellee,

v.

ROBERT WAYNE INFANTE,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. D. Brock Hornby, U.S. District Judge]

Before

Torruella, Ripple[*] and Howard,
Circuit Judges.

J. Hilary Billings, Assistant Federal Defender, for appellant.
Margaret D. McGaughey, Assistant United States Attorney, with whom Thomas E. Delahanty, II, United States Attorney was on brief, for appellee.

December 11, 2012

[*]Of the Seventh Circuit, sitting by designation.

**HOWARD**, **Circuit Judge**.  Appellant Robert Wayne Infante was charged with five criminal offenses[1] based on the discovery of marijuana plants and pipe bombs in his home, and on his statements to law enforcement.  Infante moved to suppress the evidence seized from his home, claiming that it was discovered pursuant to a search that violated his Fourth Amendment rights.  He also moved to suppress his statements to investigators on the grounds that he was not advised of his <u>Miranda</u> rights and that the officers continued to interrogate him after he invoked his rights to remain silent and to have counsel present.  The district court denied both motions, and Infante subsequently pled guilty to four counts of the indictment,[2] conditioned on his right to appeal the suppression rulings.  Finding no error in the denial of his suppression motions, we affirm.

## I.  BACKGROUND

## A.  The Entry and Search of Infante's Residence

At approximately 8:50 a.m. on June 25, 2010, Infante placed a 911 call and requested an ambulance at 60 Avery Road in

---

[1] The charged offenses were:  (1) being a felon in possession of a firearm and ammunition, <u>see</u> 18 U.S.C. §§ 922(g)(1) and 924(a); (2) possession of an unregistered destructive device, <u>see</u> 26 U.S.C. §§ 5841, 5845(f), 5861(d), and 5871; (3) manufacturing marijuana, <u>see</u> 21 U.S.C. § 841(b)(1)(B); (4) possession of a destructive device in relation to a drug trafficking offense, <u>see</u> 18 U.S.C. § 924(c)(1)(B)(ii); and (5) possession of a firearm in relation to a drug trafficking offense, <u>see</u> 18 U.S.C. § 924(c)(1)(A)(I).

[2] The fifth count was dismissed on the government's motion.

Alfred, Maine. Sounding agitated, he explained that he had just severed the tip of his finger and lacerated the side of his hand when a propane tank exploded. When the 911 dispatcher made further inquiries, Infante added that "a small little hand-held propane tank exploded on me." He affirmed that he was home alone. Asked whether anything was still burning or smoldering, he replied, "No, it just went bang big time." Infante stated that he was out of danger and was securing his home because he was going to be absent. The dispatcher advised him that help was on the way.

At 8:53 a.m., the dispatcher broadcast a regional "fire call and rescue" regarding "a propane explosion" at 60 Avery Road, where a "[m]ale, by himself, has a large cut, and finger amputated." The Alfred Fire Department responded, inquiring whether any fire or structure was involved. The dispatcher replied, "None that I'm seeing, doesn't list anything, just a propane explosion, and the finger amputation." The dispatcher did not disclose the reported size of the propane tank.

At the Alfred fire station, firefighter paramedic Andrew Stevenson and veteran firefighter George Donovan donned their firefighting gear and headed for the scene of the emergency within three minutes of hearing the broadcast. Stevenson drove an ambulance and Donovan followed in a fire engine. Lieutenant Marc Cunningham, a volunteer firefighter and the highest-ranking Alfred Fire Department official responding to the 911 call, reported being

-3-

on his way as well.  Two other volunteer firefighters, Greg Roussin and Robert Plumpton, heard the broadcast and started toward 60 Avery Road in their personal vehicles.

Approximately ten minutes after his initial call, Infante called 911 again to report that he was driving himself to a hospital because the ambulance was taking too long.  The dispatcher broadcast a bulletin that the 911 caller had left the area and was en route to a hospital.  Stevenson heard the broadcast at about the same time as he saw a man drive past him in the opposite direction with hazard lights flashing.  He advised the dispatcher that he suspected this was the 911 caller.  The dispatcher, who was on the phone with Infante, persuaded him to pull over so that Stevenson could attend to his hand.  Following behind, Donovan assisted Stevenson.

Stevenson and Donovan observed that Infante had a number of superficial "shrapnel" wounds on his chest and one hand wrapped in a bloody towel.  Stevenson unwrapped the towel and saw that Infante was missing the top of the middle finger on his left hand and had a deep cut between his thumb and index finger.  As Stevenson was bandaging the wounds, he asked Infante how the injury had occurred.  Infante explained that he was filling a butane lighter when it exploded.  He told Stevenson that the incident had occurred inside his house.  When Donovan inquired about the

location of the explosion, Infante gave a vague response.[3]  Despite Stevenson's urging that he should go to the hospital by ambulance, Infante refused because he did not want anyone else to drive his car.  Once his hand was bandaged, Infante got into his car and left.  Stevenson radioed that he was returning to the fire station, while Donovan proceeded to 60 Avery Road.

Cunningham, the commander that day, was first to arrive at Infante's residence.  He walked the perimeter of the house, including about twenty-five feet into the woods behind the house to the site of a fire pit, to check for signs of a fire or explosion and found neither.[4]  The front and rear doors to the house were locked.  The other firefighters joined Cunningham shortly thereafter.  When Donovan arrived, he informed Cunningham that Infante did not give him a clear answer when he asked where the explosion had occurred.  Although it did not react to the presence of the two firefighters who arrived first, Infante's loose wolf-dog hybrid began growling at the firefighters once all four were present.  They could not approach the house until an animal control officer contained the dog, a process that took about 30 minutes.

---

[3] Donovan was present for most of the conversation between Stevenson and Infante, but he did not hear Infante tell Stevenson that the explosion had occurred inside the house.

[4] An abandoned school bus was parked near the driveway but neither Cunningham nor his fellow firefighters checked to see whether the explosion had occurred there.  Plumpton observed containers filled with fireworks in the bus, and Cunningham was aware of their presence as well.

In the meantime, Cunningham verified with Stevenson that Infante had told him that the explosion had occurred inside the residence. Cunningham also learned from Donovan that Infante had stated that a butane lighter had exploded in his hand. Plumpton observed a broken cigarette lighter in the driveway but it did not appear to have exploded and there was no blood or human tissue near it.

Once Infante's dog was contained, the firefighters walked onto a side porch of the house and looked inside through an open, screened window. They observed a trail of blood on the floor in a hallway connecting two doors. The firefighters also heard a hissing sound, which some of them thought sounded like running water.

Cunningham made the decision to enter the house to search for the source of the explosion. He testified that he wanted to "make sure there was no other hazards to anybody, to the homeowner if he were to return or to the public around the house." The firefighters considered it their obligation to enter and inspect the premises. Cunningham entered first by crawling through the open window after the screen had been removed. He then unlocked the door and the others joined him. Approximately an hour elapsed between Cunningham's arrival at 60 Avery Road and the firefighters' entry into the house.

Once inside, the firefighters observed that the blood trail led from a cellar door to a bathroom, where Cunningham confirmed that water running from a faucet was causing the hissing sound that they had heard before entering. After turning off the faucet, they followed the blood trail down the cellar stairs, observing droplets of blood on the steps as they descended. Once at the bottom of the stairwell, the firefighters immediately observed what appeared to be marijuana plants, alongside growing equipment. They collectively agreed not to touch the plants. After instructing Roussin to get a camera from the fire engine, Cunningham advised the rest to continue to search for the source of the explosion. One of the firefighters observed more marijuana plants in another part of the basement.

Donovan walked to the left of the stairwell, following the blood trail until it stopped. Because there was no indication that the explosion had occurred at the apparent inception of the blood trail, Donovan walked further into the cellar until he accidentally kicked an object that looked like an upside-down hubcap. He observed underneath it what appeared to be three pipe bombs and immediately alerted the other firefighters. After Roussin took photographs of the plants and the apparent pipe bombs, the firefighters exited the house.

Cunningham then called for backup from the state police and the fire marshal's office.  Individuals from those agencies eventually arrived and inspected the cellar.  An investigator from the fire marshal's office ordered an evacuation of the surrounding area and then arranged for disposal of the pipe bombs.

## B.  **The Hospital Interviews**

After refusing ambulance transportation, Infante drove himself to a hospital in Biddeford, Maine.  Once his wounds were cleaned and bandaged, Infante was transferred to a treatment room in the emergency department to await surgery for his hand later that afternoon.  In the meantime, Daniel Young, an investigator with the fire marshal's office, interviewed Infante twice.  Paul Shaw, an agent with the Maine Drug Enforcement Agency, was also present during both interviews.  Neither officer read Infante his Miranda rights.  Both Young and Shaw were in plainclothes.  Young wore a gun and a badge at hip level.  Shaw also carried a holstered weapon.

The first interview occurred at approximately 11:30 a.m. and lasted about twenty-six minutes.  Young and Shaw entered the treatment room where Infante was lying in a bed with his bandaged hand elevated.  He had been administered morphine for pain prior to the interview.  Upon entering the room, Young turned on a tape recorder and informed Infante that he was recording their conversation.  Young stood at the foot of the bed, between Infante

and the closed door to the room. Shaw primarily sat in a chair to the side of the bed. Young's supervisor, Sergeant Kenneth Grimes, briefly entered the room. Throughout the interview, Infante was coherent, responsive, and did not appear impaired. Neither Young nor Shaw touched him or otherwise restricted his movement.

Young began the first interview by telling Infante:

> This is your voluntary statement. You don't have to give it to me, you don't have to talk to me if you don't want to. You're in a hospital bed. Obviously you can't leave. You have some serious hand injuries. So, we're giving you the opportunity to talk with us if you want. There's a couple things I want to ask you about . . . . Ok, and again this is all voluntary. You're not in custody. You're not under arrest at this point. Ok. But I need to know a couple of things.

Young then asked Infante about a wired battery that had been observed in his car in the hospital parking lot, explaining that it had raised a concern "because of some of the stuff we found at your residence." Infante wanted to know how the officers got into his house, but Young turned the conversation back to Infante's car.

After Infante consented to a search of his car, Young indicated that he wanted to ask Infante about his injuries. Young prefaced the questioning by telling Infante once again that he was not under arrest or in custody, adding, "[y]ou don't have to [talk to us] obviously, voluntary." At that point Infante said, "I may as well just plead the 5th and go for a lawyer." Young acknowledged the request and informed Infante that firearms, bomb

squad, and drug enforcement agents were on their way to the hospital. Infante responded by asking again how the officers got into his house, and Young explained that the firefighters entered based on reports of an explosion. When Infante retorted that he had nothing else to say, Young said he wanted to know how Infante had injured his hand but could not talk to him unless Infante revoked his request for counsel. Infante replied, "Yeah, I'll talk to you," and then explained that a plastic prescription bottle filled with pyrotechnic powder that he had extracted from "snap pops" fell off his work bench and exploded in his hand when he tried to catch it.

At one point during the interview, Infante asked whether he could smoke a cigarette, and Young replied, "Not in here because they have oxygen." Shaw added, "I don't even think right on hospital property you can anymore." The interview ended after Infante asked for more pain medication. Infante invited Shaw to remain in his room.

Approximately an hour and ten minutes later, Young returned to Infante's treatment room for a second interview. Shaw was still there. Young turned on the tape recorder and began by asking Infante if he would permit investigators to take custody of his clothing. Young reiterated that Infante was not under arrest or in custody and that he would be handing over his clothing voluntarily. He later added, "you don't mind us taking [your

-10-

clothes] voluntarily because you know we can get a warrant." When Infante agreed, another plainclothes officer came into the room with evidence bags to collect the clothes. Young then questioned Infante about the explosion, again prefacing his questioning by saying, "This is all voluntary. You don't have to talk to us." In response, Infante explained that he was extracting the powder from snap pops in order to mix it with gun powder and put it into pipe bombs.

Young observed no change in Infante's demeanor during the second interview. Again, neither Young nor any other officer touched Infante or restrained his freedom of movement in any way. Hospital personnel came and went during the interview, which lasted about twenty-one minutes.

## II. DISCUSSION

Infante moved to suppress both the evidence seized from his home and his statements at the hospital. The district court denied both motions. We review the denial of a motion to suppress for clear error as to questions of fact; we apply de novo review as to the application of law to those facts and to conclusions of law. United States v. Rheault, 561 F.3d 55, 58 (1st Cir. 2009). Applying these standards, we conclude that the district court did not err when it denied Infante's motions.

## A.  <u>Warrantless Entry and Search</u>

The Fourth Amendment protects the right of the people to be secure against unreasonable searches and seizures by the government.  Although the paradigmatic Fourth Amendment challenge involves actions of law enforcement officers, the protection against unreasonable searches and seizures does not wane "simply because the official conducting the search wears the uniform of a firefighter rather than a policeman, or because his purpose is to ascertain the cause of a fire rather than to look for evidence of a crime."  <u>Michigan</u> v. <u>Tyler</u>, 436 U.S. 499, 506 (1978).  Because "the prophylaxis of the Fourth Amendment is at its zenith with respect to an individual's home," <u>United States</u> v. <u>Martins</u>, 413 F.3d 139, 146 (1st Cir. 2005), a warrantless search of a private residence is presumptively unreasonable unless one of a few well-delineated exceptions applies.  <u>United States</u> v. <u>Romain</u>, 393 F.3d 63, 68 (1st Cir. 2004).

One such exception is the emergency doctrine, which we have recognized as a subset of the traditional exigent circumstances exception to the warrant requirement.  <u>United States</u> v. <u>Beaudoin</u> 362 F.3d 60, 66 (1st Cir.), <u>cert. denied</u>, 543 U.S. 979 (2004); <u>accord</u> <u>Martins</u>, 413 F.3d at 147.  Under this doctrine, warrantless entry is justified when there is reasonable belief that "swift action is required to safeguard life or prevent serious harm."  <u>Martins</u>, 413 F.2d at 147.  The burden is on the government

to show a reasonable basis, approximating probable cause, both for the government official's belief in the existence of an emergency and for associating the perceived emergency with the area or place to be searched.  Id.; Beaudoin, 362 F.3d at 66.  "The requisite inquiry must be undertaken in light of the totality of the circumstances confronting the [official], including, in many cases, a need for an on-the-spot judgment based on incomplete information and sometimes ambiguous facts bearing upon the potential for serious consequences."  Martins, 413 F.3d at 147.

In the present case, the following objective facts were known to the firefighters before they entered Infante's residence. They were asked to respond to a "fire call and rescue" at Infante's residence for a "propane explosion" that had severed Infante's finger and caused a deep laceration on his hand.  Stevenson and Donovan witnessed Infante's significant injuries, including multiple shrapnel-type wounds on his chest, albeit without any metal debris.  Infante told them that a butane lighter had exploded in his hand while he was filling it.  Stevenson heard him say that the explosion had occurred inside his house and conveyed this information to Cunningham.  An inspection of the exterior of the residence and its immediate surroundings, including the site of a fire pit located in the woods behind the house, revealed no signs

that the explosion had occurred outside.[5]  When they looked into the house through a window, the firefighters observed a blood trail in a hallway between two doorways.  From that vantage point, they also heard a hissing sound that, according to the district court's finding, was "probably, but not necessarily, [] the sound of running water."

Based on these facts, the firefighters had a reasonable basis, approximating probable cause, both to believe that there was an emergency and to associate the emergency with the inside of Infante's residence.  Infante's reports of an explosion involving volatile gas, whether propane or butane, coupled with his significant wounds that were consistent with the occurrence of an explosion, caused the firefighters to reasonably perceive an emergency -- the prospect of a secondary explosion resulting from escaping gas.  Under these circumstances, the danger of a secondary explosion is akin to that of a rekindling fire that the Supreme Court identified in Tyler as a continuing danger that justified fire officials' remaining in a building for a reasonable time after extinguishing a fire in order to promptly investigate its cause. See Tyler, 436 U.S. at 510; see also Michigan v. Clifford, 464 U.S.

---

[5] That one of the firefighters observed a broken cigarette lighter in the driveway does not lend itself to an inference that the explosion had occurred outside, nor that the cause of the explosion was a butane lighter rather than a propane tank. Roussin, who observed the lighter, testified that the lighter did not appear to have exploded and there was no blood or human tissue near it, as one would reasonably expect given Infante's injuries.

-14-

287, 293 (1984) ("Because determining the cause and origin of a fire serves a compelling public interest, the warrant requirement does not apply in such cases.").  Indeed, relying in part on the Court's reasoning in Tyler, a number of our circuits have held that the presence of potentially explosive chemicals can justify warrantless entry into a home.  See, e.g., United States v. Boettger, 71 F.3d 1410, 1414 (8th Cir. 1995) (warrantless search justified based on "[a] continuing danger [] created by the apparent presence of explosive chemicals and destructive devices"); United States v. Martin, 781 F.2d 671, 674-75 (9th Cir. 1985) (citing Tyler for the proposition that warrantless search was justified when an officer who responded to a report of an explosion at the defendant's home searched it "to determine the cause of the explosion and to ensure that additional explosions or fire would not occur"); United States v. Urban, 710 F.2d 276, 278 (6th Cir. 1983) ("[T]he presence of potentially explosive chemicals in the defendant's house are exactly the kind of 'continuing dangers' the Tyler Court had in mind when it ruled that investigating officials could remain on the premises for a reasonable time after the blaze to determine its cause."); United States v. Callabrass, 607 F.2d 559, 564 (2d Cir. 1979) (post-fire entry justified in part due to "need to dispose of the dangerous chemicals quickly so as to render the premises safe").

The second prong of the emergency doctrine is satisfied as well. The firefighters had a reasonable basis, approximating probable cause, to associate the emergency with the place searched. Before they stepped onto Infante's porch and peered through his window, an action that Infante challenges as an unlawful search of the curtilage of his home, see Oliver v. United States, 466 U.S. 170, 180 (1984), the firefighters had a reasonable basis to believe that the explosion had occurred inside the house. Not only was there no indication that the explosion had occurred in the immediate vicinity of the residence, leading to a reasonable inference that it had occurred inside, but the responding firefighters also knew that Infante had told Stevenson that the explosion had happened in the house.[6] Accordingly, the firefighters were justified in approaching the house and looking inside through a window. From that lawful vantage point, they observed a trail of blood leading from one doorway to another, consistent with Infante's injuries having occurred therein. Armed

---

[6] Infante argues that the firefighters were not sufficiently thorough in searching for the origin of the explosion outside of his residence, faulting them for not checking beyond twenty-five feet into the woods behind the house, or inspecting an apparently inoperable school bus parked near the driveway. Under the circumstances, however, the outdoor search for the source of the explosion, coupled with Infante's statement that the explosion had occurred inside the residence, was sufficient to establish a reasonable probability that the explosion had not occurred outside. See Acosta v. Ames Dep't Stores, Inc., 386 F.3d 5, 11 (1st Cir. 2004) ("[W]e have made it clear that an officer normally may terminate her investigation when she accumulates facts that demonstrate sufficient probable cause.").

with this further indicium associating the emergency with the inside of Infante's residence and unable to see the source of the explosion from their standpoint, the firefighters had sufficient grounds to enter the residence without a warrant.

Once inside, the firefighters observed that the trail of blood led from a bathroom to the cellar, and they limited the scope of their search for the explosion's origin to the cellar. At the bottom of the stairwell, they observed in plain view marijuana plants and growing equipment. Donovan then followed the blood trail to its apparent inception. Because he did not find the source of the explosion at that location, the justification for the search continued. Cf. United States v. Brown, 449 F.3d 741, 750 (6th Cir. 2006) (officer who reasonably believed burglary was in progress in the defendant's basement but found no one in the main area of the basement justifiably searched the interior room of the basement). It was therefore reasonable for Donovan to continue the search further into the cellar, at which point he accidently kicked an upside-down hubcap containing what appeared to be three pipe bombs.[7]

_____

[7] Infante does not argue that the firefighters' search beyond the apparent origin of the blood trail was unreasonable. Although there is no precise indication in the record as to how much further Donovan walked beyond the trail when he stumbled upon the pipe bombs, we are satisfied that the scope of the search was reasonable. Indeed, given the dispersive nature of explosions, it would have been questionable to assume that remnants of an explosion sufficiently forceful to sever Infante's finger would have necessarily come to rest in the immediate vicinity where the

-17-

Infante seeks to debunk the reasonableness of the firefighters' warrantless entry by pointing out that there were no objective signs indicating an ongoing process inside the house, and that they were merely speculating about potential dangers therein. But the continuing danger of a secondary explosion qualifies as an emergency. In light of a substantiated report of a recent explosion involving a volatile gas in the residence, this danger was not speculative. Under these circumstances, hinging the reasonableness of the firefighters' perception of the danger on their detection of objective signs of an impending explosion, assuming that there would be any, would improperly raise the probable cause standard to at least "highly probable." See Acosta v. Ames Dep't Stores, Inc., 386 F.3d 5, 11 (1st Cir. 2004) ("The test for probable cause does not require the officers' conclusion to be ironclad, or even highly probable. Their conclusion that probable cause exists need only be reasonable." (internal quotation marks omitted)).

Infante also argues that even if the firefighters were reasonable in their belief about the risk of a secondary explosion, the perceived danger is not cognizable under the emergency doctrine because it involved mere risk of damage to property, as opposed to risk of harm to persons. The argument is unavailing. In defining

bleeding had started.

-18-

the contours of the emergency doctrine, we have said that it involves situations where immediate action is required to safeguard life or prevent serious harm. Martins, 413 F.2d at 147; Beaudoin 362 F.3d at 66. We need not answer here whether danger of harm to property can constitute a sufficient emergency to permit warrantless entry because risk of harm to persons was clearly present. Most obviously, had he returned home, Infante himself would have been at risk of injury from a secondary explosion. An explosion at his residence also would have posed a threat to any third person whom Infante allowed on the premises. The firefighters therefore had a reasonable basis for believing that continuing danger of a secondary explosion posed a risk not only to the house but also to the resident, should he return, and to the public near the house.

We conclude that the firefighters' warrantless entry into Infante's residence and their search of his cellar fall within the emergency exception to the warrant requirement. Accordingly, the district court did not err in denying Infante's motion to suppress the evidence that the firefighters observed in plain view.[8] See Clifford, 464 U.S. at 294 ("If evidence of criminal activity is

---

[8] Infante did not argue below or on appeal that the contraband was not in plain view, nor did he challenge subsequent entries into his residence by law enforcement. Accordingly, we do not address those matters.

discovered during the course of a valid administrative search, it may be seized under the 'plain view' doctrine.").

**B.  <u>Hospital Interviews</u>**

Infante appeals the district court's denial of his motion to suppress the statements he made to investigators at the hospital on two grounds.  First, he argues that the hospital interviews amounted to a custodial interrogation and the officers failed to advise him of his <u>Miranda</u> rights.  Second, he contends that the interrogation should have ceased once he invoked his rights to remain silent and to have counsel present.  The district court found that Infante was not in custody during the interviews, obviating the need for <u>Miranda</u> warnings and for heeding Infante's invocation of his rights under the Fifth and Sixth Amendments.  We perceive no error in that determination.

Law enforcement officers must give <u>Miranda</u> warnings before interrogating an individual who is "taken into custody or otherwise deprived of his freedom of action in any significant way." <u>Stansbury</u> v. <u>California</u>, 511 U.S. 318, 322 (1994) (internal quotation marks omitted).  In the absence of a formal arrest, whether an individual is in <u>Miranda</u> custody depends on whether there is a "restraint on freedom of movement of the degree associated with a formal arrest." <u>Maryland</u> v. <u>Shatzer</u>, ___ U.S. ___, 130 S. Ct. 1213, 1224 (2010) (internal quotation marks omitted).  The determination involves two distinct inquiries:

"first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave."[9]  Thompson v. Keohane, 516 U.S. 99, 112 (1995).  When an individual is unable to "leave" the place of the interrogation solely due to circumstances incident to medical treatment, the question is said to be slightly different:  whether he or she was at liberty to terminate the interrogation and "cause the [officers] to leave." United States v. New, 491 F.3d 369, 373 (8th Cir. 2007); see United States v. Jamison, 509 F.3d 623, 628 (4th Cir. 2007) (whether an individual whose freedom of movement is restricted due to medical treatment is subject to Miranda custody depends on "whether a reasonable person would feel free to decline officers' requests or otherwise terminate the encounter" (quoting Florida v. Bostick, 501 U.S. 429, 436 (1991))).  This approach is consistent with the Miranda custody analysis in other contexts where factors independent of the interrogating officers' conduct restrict an individual's freedom of movement. See, e.g., Shatzer, 130 S. Ct. at 1224 (restriction in freedom of movement incident to incarceration for prior conviction insufficient for Miranda custody); United States v. Ellison, 632 F.3d 727, 729 (1st Cir.),

_____

[9] Because the first inquiry is distinctly factual, we review the district court's assessment of the circumstances for clear error. United States v. Hughes, 640 F.3d 428, 435 (1st Cir. 2011). The latter involves the application of law to fact, warranting de novo review. Id.

-21-

cert. denied, 131 S. Ct. 295 (2010) (that a pre-trial detainee interrogated on matters unrelated to the pending charges "is not in the position of a suspect who is free to walk away and roam around where he pleases" does not "equate his condition during any interrogation with Miranda custody.").

Bearing in mind that the inquiry into whether an individual is in custody for purposes of Miranda is one of the totality of the circumstances, we have identified several factors that guide the analysis. Those factors include "whether the suspect was questioned in familiar or at least neutral surroundings, the number of law enforcement officers present at the scene, the degree of physical restraint placed upon the suspect, and the duration and character of the interrogation." United States v. Hughes, 640 F.3d 428, 435 (1st Cir. 2011) (internal quotation marks omitted).

The district court assessed the circumstances of Infante's interviews as follows. During both interviews, Young repeated to Infante several times that the interview was voluntary, that Infante did not have to talk to him, and that Infante was not under arrest or in custody. The officers who were present did not make physical contact with Infante, nor did they impede hospital personnel from coming and going freely. The interviews were relatively short. Young and Shaw were in plainclothes and their weapons remained in their holsters. The atmosphere was non-

confrontational. Infante even shared several jokes with the officers and felt comfortable enough to invite Shaw to remain in his room between interviews. Despite having received pain medication, Infante was coherent and responsive, showing no sign of mental impairment. When he asked whether he could smoke a cigarette, the officers cited the presence of oxygen and hospital policy against smoking, rather than conveying that they controlled Infante's environment. Although Young stood between Infante and the closed door to the room, the remaining circumstances neutralized any resulting inference of custody. Finally, Young collected Infante's clothing only after obtaining his permission.

Infante argues that the district court misperceived the environment that the officers created in his hospital room. He points to several facts that the district court did not explicitly address to support his position that the conduct of the officers was confrontational. Young informed Infante that a search of his house had revealed incriminating evidence, that agents from various law enforcement agencies were on their way to the hospital, and that he was aware of Infante's prior criminal record. When requesting Infante's clothing, Young stated, "you know we can get a warrant." And when Infante invoked his rights to remain silent and have counsel present, the interrogation continued.

To be sure, certain elements, taken in isolation, may suggest an inference of custody, but the record amply supports the

district court's finding that the atmosphere was non-confrontational. See Hughes, 640 F.3d at 437 ("Where the signals are mixed, the district court's choice between competing inferences cannot be clearly erroneous."). Accordingly, we find no clear error in the district court's assessment of the interviews.

Based on the circumstances surrounding the questioning, a reasonable person in Infante's position would have felt free to terminate the interviews and ask the officers to leave. See Jamison, 509 F.3d at 628-29; New, 491 F.3d at 373-74. Although the hospital room where the interviews occurred may not have been a surrounding familiar to Infante, we are satisfied that it was at least a neutral setting. First, Infante went to the hospital of his own accord to receive treatment for his injuries. See Martin, 781 F.2d at 673 (in finding no Miranda custody where the defendant was questioned in a hospital, emphasizing that the defendant went to the hospital with his brother, and that law enforcement was neither involved in his hospitalization nor in extending his hospital stay). Second, hospital staff came and went freely during the course of the interviews, suggesting that the officers were "not in a position to dominate [the setting] as they are, for example, an interrogation room at a jailhouse." United States v. Jones, 187 F.3d 210, 218 (1st Cir. 1999).

The number of officers present during the interviews was not overwhelming, lending support to a finding that the questioning

was non-custodial.  For the most part, only two officers were in the room, joined briefly by two others.  See Hughes, 640 F.3d at 436 (finding no custody where two officers participated in the questioning and two others remained apart); United States v. Quinn, 815 F.2d 153, 157, 161 (1st Cir. 1987) (finding no custody despite presence of five officers).

Although Infante was confined to his hospital bed, with his bandaged hand elevated, the officers did nothing to restrain his movement.  See Jamison, 509 F.3d at 629 ("[T]o the extent [the defendant] felt constrained by his injuries, the medical exigencies they created . . . should not factor into our [Miranda custody] analysis."); New, 491 F.3d at 373-74 (no custody found where the defendant was confined to his hospital bed in a neck brace but no restraint was imposed by the interrogating officer).  No officer made physical contact with Infante.  See Hughes, 640 F.3d at 436 (considering the same as a relevant factor supporting no-custody finding).  Nor did the officers act in a threatening manner.  Young and Shaw were in plainclothes and their visible weapons remained holstered at all times.  See id. (although officers carried visible weapons, that no weapon was ever brandished supported a finding that the interrogation was non-custodial).

The duration and nature of the interviews are also consistent with a finding that Infante was not in custody.  The interviews were relatively short, lasting approximately twenty-six

-25-

minutes and twenty-one minutes.  See id. at 437 (a ninety-minute interview not found custodial); United States v. Nishnianidze, 342 F.3d 6, 14 (1st Cir. 2003) (interview lasting forty-five minutes did not implicate Miranda).  They occurred in the late morning and early afternoon, as opposed to a time that might have appeared more menancing.  See Hughes, 640 F.3d at 437 (time of day is a factor in the custody analysis).  Finally, we note here again that Young informed Infante during each interview that he was not under arrest or in custody and that he did not have to speak with the officers, thereby communicating the non-confrontational nature of the interviews.  See United States v. McCarthy, 475 F.3d 39, 46 (1st Cir. 2007) (emphasizing officers' similar statements in concluding that the defendant was not in custody).  That Infante at times shared laughs with the officers and even invited one of them to stay in his room between interviews reinforces the notion that the officers' approach was non-threatening.  Accordingly, because Infante was not in custody while he was questioned at the hospital, the officers were not required to give him Miranda warnings.

The absence of custody is also dispositive of Infante's charge that the officers impermissibly continued to question him after he invoked his rights to remain silent and to have counsel present.  Because he was not in custody, the officers were not obligated to respect his attempted invocation of those rights.  See Ellison, 632 F.3d at 731 ("[E]ven if Ellison had clearly expressed

-26-

a desire to speak with a lawyer, he could not have invoked any constitutional right to do that in a non-custodial interrogation . . . ."); cf. McNeil v. Wisconsin, 501 U.S. 171, 182 n.3 (1991) ("We have in fact never held that a person can invoke his Miranda rights anticipatorily, in a context other than custodial interrogation[.]" (internal quotation marks omitted)).

## III.  CONCLUSION

For the foregoing reasons, we **affirm** the district court's denial of Infante's motions to suppress evidence.


## -Dissenting Opinion Follows-

**TORRUELLA**, <u>**Circuit Judge**</u> **(Dissenting).**  I respectfully dissent because I believe the majority has stretched the emergency doctrine beyond its limit, to the point where a warrantless entry into a person's home is no longer based on a reasonable suspicion of an ongoing emergency, but rather on speculation-based hypotheses lacking in objective factual support.  The facts of this case, as found by the magistrate judge, compel me to reach the opposite conclusion from that of my colleagues, namely that there was no ongoing emergency inside Infante's home to justify the firefighters' warrantless entry there.  There certainly was a legitimate need to inspect the inside of Infante's home to ascertain how the explosion occurred, but absent exigent circumstances, such a search necessitated an administrative search warrant to comply with the strictures of the Fourth Amendment.

I begin my analysis with a look at <u>Michigan</u> v. <u>Clifford</u>, 464 U.S. 287 (1984), a plurality opinion cited by the majority, because I believe it lays the proper framework for resolving the question on whether the firefighters' warrantless entry in this case ran afoul of the Fourth Amendment.  There, firefighters were called upon to extinguish a fire at the residence of the defendants, who were out of town.  After the blaze was extinguished at 7:04 am, all police and firefighting personnel left the vicinity of the house.  Around five hours later, a team of arson investigators arrived at the residence for the first time to

-28-

investigate the cause of the blaze. Without a warrant, and without the consent of the defendants, the investigators entered the home and began an extensive search of the premises, commencing with the basement. At the basement, they found and seized evidence suggesting defendants had committed arson, and based on this evidence they proceeded to search the rest of the house, where they found additional evidence. The defendants sought to suppress all of the evidence, arguing that it had been obtained pursuant to a warrantless search that violated their rights under the Fourth and Fourteenth Amendments. Id. at 291.

A plurality of the Supreme Court agreed with the defendants and concluded that, where reasonable expectations of privacy remain in fire-damaged premises, searches into the cause and origin of a fire are subject to the warrant requirement of the Fourth Amendment, absent consent or exigent circumstances. Id. at 291-92, 297. The Justices noted that the constitutionality of warrantless entries onto fire-damaged premises depended on three factors, namely: (i) "whether there are legitimate privacy interests in the fire-damaged property that are protected by the Fourth Amendment;" (ii) "whether exigent circumstances justify the government intrusion regardless of any reasonable expectations of privacy;" and (iii) "whether the object of the search is to determine the cause of the fire or to gather evidence of criminal activity." Id. at 292.

-29-

The government in Clifford conceded that there were no exigent circumstances to justify its post-fire searches, but argued nonetheless that the Court should exempt all searches aimed at ascertaining the origin and cause of a fire from the warrant requirement, or in the alternative that it modify its decision in Michigan v. Tyler, 436 U.S. 499 (1978), to permit such post-fire searches. Clifford, 464 U.S. at 296. The Justices declined both invitations, noting that the post-fire search by the arson investigators was not merely the continuation of the earlier search, but rather was an independent search divorced from any need to attend to an emergency. Id. at 296-97. This set the case apart from Tyler, where the post-fire entry was held to be a continuation of the initial entry made by the firefighters, because after extinguishing the blaze they were not able to secure the premises and complete their investigation, due to the dark and smoky conditions. Id. at 296. In the end, the plurality determined that the investigators' post-fire search of the basement was illegal because it was conducted without an administrative search warrant and absent exigent circumstances. Id. at 297-99. The Court invalidated the ensuing search of the remainder of the house as it was carried out without a traditional criminal search warrant based on probable cause. Id.

Proceeding to apply the three factors elucidated in Clifford to the facts of this case, I conclude that: (i) Infante

had retained a significant privacy interest in his home after he left for the hospital; (ii) there were no exigent circumstances compelling the firefighters' warrantless entry; and (iii) the firefighters' primary object in conducting that entry was to search for the cause and origin of the explosion, and absent an emergency, an administrative search warrant was needed to protect Infante's Fourth Amendment rights.

In Clifford, the plurality noted that "[s]ome fires may be so devastating that no reasonable privacy interests remain in the ash and ruins, regardless of the owner's subjective expectations." Id. at 292. Such is not the case here. The record reflects that after the explosion, Infante told the 911 dispatcher that he was going to take care of things and secure his house because he was not going to be there. When intercepted by Stevenson and Donovan on the way to the hospital, he also cautioned them against going to his home, because he kept a wolf-dog loose on the property. Despite the presence of this animal, the firefighters were able to approach the house, which had no appreciable damage, and determine that its exterior doors were locked. Therefore, it is clear that Infante had time to secure his house after the explosion occurred, and took precautions to ensure that no intruders would be able to gain access. After taking care of his injuries, it would have been highly probable for

him to return to his home and resume his normal life, an indication that he still harbored a strong expectation of privacy there.

The record also belies the assertion that an ongoing emergency was in progress at the time the firefighters arrived. Under the emergency doctrine, in order to make a valid entry into Infante's home without a warrant, there must have been an emergency situation requiring prompt action by the firefighters to "save someone's life or prevent harm." United States v. Beaudoin, 362 F.3d 60, 66 (1st Cir. 2004), rev'd on other grounds sub nom. Champagne v. United States, 543 U.S. 1102 (2005); see also United States v. Moss, 963 F.2d 673, 678 (4th Cir. 1992) (holding that, to invoke the "emergency doctrine," the official who makes the entry must have an objectively reasonable belief that an emergency existed that required immediate action "to render assistance or prevent harm to persons or property within"); Tierney v. Davidson, 133 F.3d 189, 196 (2d Cir. 1998)("[P]olice officers may enter a dwelling without a warrant to render emergency aid and assistance to a person whom they reasonably believe to be in distress and in need of that assistance."). In Beaudoin we held that an entry pursuant to the emergency doctrine required "a reasonable basis, sometimes said to be approximating probable cause, both to believe in the existence of the emergency and to associate that emergency with the area or place to be searched." 362 F.3d at 66.

The majority has concluded that the firefighters in this case were aware of sufficient objective facts to create a reasonable belief in their minds that an emergency was in progress which required their prompt entry into Infante's home. They point out to the dispatch's broadcast heard by the firefighters announcing a "fire call and rescue" stemming from a "propane explosion" that had severed part of an individual's finger and lacerated his hand. Maj. Slip Op. at 13. The majority also places much emphasis on the fact the broadcast reported a propane explosion, while Infante later told Stevenson that the explosion had occurred when he was filling up a butane lighter. Id. They further recount how the firefighters observed blood inside the house and heard a "hissing noise" emanating from within. Id. at 14. From this factual scenario, the majority concludes that "Infante's reports of an explosion involving volatile gas, whether propane or butane, coupled with his significant wounds that were consistent with the occurrence of an explosion, caused the firefighters to reasonably perceive an emergency -- the prospect of a secondary explosion resulting from escaping gas." Id.

I find it difficult to subscribe to this view as in this case there were no objective indicia to suggest that volatile gas was somehow venting from within the residence. First, the firefighters testified at the suppression hearing that they knew, before entering the house, that the "hissing sound" they heard was

-33-

most likely that of a water faucet left on by someone, and not of "escaping gas," as the majority seems to intimate. Second, the majority has merely stated that the fact that an explosion occurred, whether from a propane tank or a butane lighter, and of sufficient force to sever the tip of Infante's finger, can also lead to a reasonable belief that volatile gas was creeping inside the residence, thereby posing an immediate risk of a secondary explosion. Yet the occurrence of one explosion does not automatically give rise to an inference that another may follow, and the majority has not explained how a butane lighter, or a similar type of container exploding, can conceivably lead to a danger of that magnitude. And although the firefighters had been informed by Sanford dispatch that the explosion had originated from a propane tank of indeterminate proportions, it was highly unlikely that a propane tank caused Infante's injuries, or at least one large enough to create the type of risks envisioned by the majority.

Stevenson himself testified that Infante's injuries were more consistent with Infante's account of a butane lighter exploding than with the dispatch's report of a blast from a propane tank. He later clarified that he thought the injuries were caused by something "a little bit larger" than a butane lighter, given the lesions he observed on Infante's chest. In any case, it is extremely unlikely that the injuries could have been caused by an

explosion of a propane tank of significant dimensions. Stevenson testified that it takes a "BLEVE" or a boiling liquid expanding vapor explosion, for a propane tank to explode, and that this event normally occurs when a tank is heated to a degree where the liquid inside will turn into vapor, to a point where the material of the tank is unable to contain the increase in pressure, which in turn causes the tank to explode. However, neither Stevenson nor any of the other firefighters who testified at the suppression hearing explained how such a potent event could have happened inside Infante's home without leaving any trace for the firefighters to observe, either on the exterior of the house or the interior portion that the firefighters were able to examine through the window. If a BLEVE did occur, then it most likely originated inside some kind of container housing flammable gas, small enough for Infante to hold in his hand, but not large enough to mount an explosion of the magnitude necessary to create the hazards of a secondary explosion, fire or gas leak. Since such hazards were very remote, there was no reasonable basis, much less a reasonable basis approximating probable cause, to believe there was an <u>ongoing</u> process inside the home which necessitated immediate entry to save someone's life or prevent harm.[10]

---

[10]The majority has also justified the entry on the basis that it was necessary to protect Infante from bodily injury once he returned from the hospital. But the fact that a harm may possibly come into fruition several hours into the future does not fit with our court's delimitation of the emergency doctrine to those

I further add that none of the cases cited by the majority supports their conclusion that the search in this case was justified. These cases stem from the Supreme Court's decision in Tyler, where the Court determined that once fire officials make a warrantless entry onto a building to fight a blaze, they need not secure a warrant to remain there "for a reasonable time to investigate the cause of the blaze" after it has been extinguished. Tyler, 436 U.S. at 511. However, one must distinguish the initial entries made by officials in Tyler and its progeny -- entries which were predicated on the presence of objective circumstances that clearly beaconed the existence of an emergency -- from those officials' subsequent entries into the premises to search for the origins and causes of the fires or explosions featured in those cases. These subsequent warrantless searches have been held to be valid as long as they are a "continuation" of a valid initial entry. The problem with the majority's analysis in this case is that it incorrectly compares the initial warrantless entry into Infante's home with the subsequent searches effectuated by officials in Tyler and its progeny. The majority's logic is flawed in this respect as these latter entries were held to be valid not as their own independent entries, but as mere continuations of the

situations where "swift action is required to safeguard life or prevent serious harm." United States v. Martins, 413 F.3d 139, 147 (2005)(emphasis added).

-36-

initial warrantless entries that had been predicated on objective circumstances signaling an ongoing emergency.

In fact, in all of the cases cited by the majority, there existed sufficient objective circumstances to compel the conclusion that an ongoing emergency was present inside the structure to be searched: United States v. Boettger, 71 F.3d 1410, 1412 (8th Cir. 1995) (defendant had told officers that there was a "chemical explosion" when he was making a firecracker in his apartment, there was smoke in the apartment and one of defendant's neighbors had to help him escape from the apartment);[11] United States v. Martin, 781 F.2d 671, 672 (9th Cir. 1985) (initial entry justified because the police had received a report of a person bleeding inside the home and an officer who arrived at the scene saw and smelled smoke coming from the home); United States v. Urban, 710 F.2d 276, 277 (6th Cir. 1983) (initial entry justified because firefighters were responding to an actual fire, and when they arrived on the scene they heard hundreds of explosions originating from within the residence); and United States v. Callabrass, 607 F.2d 559, 563 (2d

---

[11]The Eighth Circuit in Boettger was not clear on whether the officials in that case were able to see the smoke inside the apartment before they entered. Yet that court seemed to justify the initial entry in that case, at least in part, on the fact that the explosion had occurred in an apartment complex with close neighbors, a circumstance not present in this case. Id. at 1414 (expectations of privacy "must be lowered where a resident admits working with explosive materials in an apartment complex with close neighbors").

Cir. 1979) (initial entry justified due to an actual observable fire in the apartment).

Conversely, none of those circumstances are present in the instant case -- as the magistrate judge's report and recommendation well noted,

> [f]rom the time of their respective arrivals at 60 Avery Road to the time they entered the residence, none of the four firefighters observed evidence of an explosion of any kind, a fire, smoke, or a propane tank as they walked around the perimeter of the residence. There was no evidence of damage to the house, and no sign of the presence of another person.

United States v. Infante, No. 10-cr-123, 2011 WL 31417, at *4 (D. Me. Jan. 3, 2011). There being no telltale signs of a fire, gas leak or any other hazard, I have to conclude that the majority's supposition that there existed a risk of a secondary explosion is entirely speculative, and such an unsubstantiated inference practically places the burden on Infante to rule out any conceivable reason for the firefighters' warrantless search. The facts of this case and the behavior exhibited by the firefighters instead give rise to a much stronger inference: that no emergency existed at all and that the only justification for the entry was to search for the origin and cause of the explosion. Moreover, the record seems to reflect that the firefighters entered the premises almost one hour after arriving on the scene. The purported reason for the delay was that they needed to wait for an animal control officer to arrive and secure Infante's dog, but the record shows

-38-

that before this animal control officer arrived, some of the firefighters were able to roam freely around the house, and were able to walk right up to the main doorway and determine that it was locked, with no interference from the animal.  Thus, if the firefighters truly believed that an emergency was in progress, such that a person's life was in peril, they would not have waited almost an hour to enter the house.  Further, after an hour of inspecting the residence and finding no noticeable change in the condition of the structure, it should have been self-evident that no emergency existed.

Absent an emergency or Infante's consent, the firefighters were required to obtain an administrative search warrant to enter Infante's home and search for the cause of the explosion. Clifford, 464 U.S. at 294. Although the Justices in Clifford reasoned that determining the cause and origin of a blaze serves a compelling public interest, they clearly stated that absent an emergency, "[i]f the primary object of the search is to determine the cause and origin of a recent fire, an administrative warrant will suffice." Id.  Firefighters will be able to obtain such a warrant if they can show that a fire of undetermined origin has occurred on the property and that the search they are proposing is reasonable in scope and will not overly intrude on the fire victim's legitimate privacy expectations. Id.; see also Camara v. Municipal Court, 387 U.S. 523 (1967).  I can think of no reason

that would compel a different requirement when the event that transpired was a small explosion instead of a fire. Accordingly, I would have required the authorities in this case to have obtained an administrative search warrant before searching Infante's home.

On a final note, I admit that the result in this case would have been different had the explosion occurred in an apartment complex or at a home located in a densely populated area. The need for prompt inspection at those locations generally outweighs a resident's expectations of privacy because of the serious dangers that a fire or an explosion might pose to neighbors who are in close proximity, especially in apartment settings. However, given the rural nature of the home's surroundings in this case, these dangers were not patently present here, a circumstance that has been overlooked by the majority.

While I do not condone Infante's conduct or his crimes, I cannot sit idly by when faced with decisions that effectively erode some of our most cherished constitutional protections. More so, when the majority's approach has been to place the burden on the defendant to prove the absence of an emergency, while making all possible inferences in the government's favor. This while disregarding the Supreme Court's teachings that warrantless entries under the Fourth Amendment must be analyzed by viewing the circumstances presented <u>objectively</u>, and without regard to individual officials' subjective intentions, no matter how well-

intended.  See Brigham City v. Stuart, 547 U.S. 398, 404 (2006). For the foregoing reasons, I would have reversed the district court's decision to deny Infante's first motion to suppress; and I would have remanded the case to the district court so that it could determine whether the statements made by Infante at the hospital should also have been suppressed as fruits of the poisonous tree.