# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>Respondent,<br><br>v.<br><br>JACOB SKYLAR ALLYN LEE,<br><br>Appellant, | No.  51633-1-II<br><br><br>UNPUBLISHED OPINION |

LEE, A.C.J. — Jacob Skylar Allyn Lee appeals his conviction for one count of vehicular homicide, arguing that the trial court erred in admitting statements he made to an officer at the crash site.  He also appeals his sentence, arguing that the community custody condition prohibiting contact with surviving family members was unconstitutionally vague and overbroad, and that the criminal filing fee and deoxyribonucleic acid (DNA) collection fee imposed as legal financial obligations (LFOs) should be stricken.  In a statement of additional grounds, Lee argues that the trial court erred in admitting his statements to officers because he was in custody and was not read his *Miranda*[1] rights.

We hold that Lee cannot raise the voluntariness of his statements for the first time on appeal, the community custody condition prohibiting contact with surviving family members is not unconstitutionally vague and overbroad, but that the challenged LFOs should be stricken.  We

---

[1]  *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602 (1966).

also hold that Lee was not in custody at the time he made the challenged statements. Accordingly, we affirm Lee's conviction but remand with instructions to strike the criminal filing fee and DNA collection fee from Lee's judgment and sentence.[2]

## FACTS

Lee was drinking with Christopher Grice and Grice's family at a tavern. Grice's family left the tavern before Lee and Grice. Later, Lee and Grice were in a one-car crash. Grice died, and Lee was severely injured.

Immediately after the accident, Lee was "hunched over and staggering" into the middle of the road. Verified Report of Proceedings (VRP) (Jan. 25, 2018) at 413. He had blood smeared on his face, and his bone was sticking out of his arm. Lee called his mother, who described him as incoherent and hysterical.

Deputy Brent Tulloch of the Pierce County Sheriff's Department was the first to arrive at the scene of the accident. He applied a tourniquet to Lee's arm to stop the bleeding and laid him on the ground. Lee seemed confused and said he did not know where his buddy was. He smelled of alcohol.

While medical personnel tended to Lee's arm, Trooper Brett Robertson of the Washington State Patrol questioned Lee for the purposes of making a collision report. Trooper Robertson

---

[2] Lee also challenges the trial courts findings of fact XIV, XV, XVII, XVIII, XXI, and XXII in the trial court's Findings of Fact and Conclusions of Law after Bench Trial, but Lee presents no supporting argument or authority for any of these challenges. We will not consider an assignment of error where there is no argument in the brief in support thereof. *State v. Coleman*, 6 Wn. App. 2d 507, 516 n.34, 431 P.3d 514 (2018). Because Lee fails to provide any argument for these assignments of error, we do not address the issues. RAP 10.3(a)(6); *Coleman*, 6 Wn. App. 2d at 516 n.34.

stated that Lee was coherent. Lee had watery, bloodshot eyes and had an "obvious odor of intoxicants from him." VRP (Jan. 23, 2018) at 104.

In response to Trooper Robertson's questions, Lee gave his name and date of birth. Lee stated that he was the driver of the vehicle, was the only occupant in the vehicle, and had fallen asleep because he was working long hours. Lee asked Trooper Robertson to look for "Chris Harbaugh" who was possibly another occupant in the vehicle because Lee "didn't know if he dropped him off or not." VRP (Jan. 23, 2018) at 103-04. And Lee stated that he was coming from Eatonville Cutoff and that Chris lived on Eatonville Cutoff.

After Lee was placed into the ambulance, Trooper Robertson asked him if he'd had anything to drink. Lee's response was that he did not, but when asked again, Lee said he had a rum and coke. Trooper Robertson also asked Lee if he had consumed any drugs, and Lee said "No." VRP (Jan. 23, 2018) at 105. Trooper Robertson then asked Lee to take a breath test, but Lee said he was having trouble breathing. Trooper Robertson terminated his encounter with Lee at that time. Trooper Robertson testified that he asked Lee questions to fill out a collision report.

The State charged Lee with one count of vehicular homicide. The State also alleged that the crime was aggravated by the defendant being under community custody at the time of the commission of the crime.

A. CRR 3.5 HEARING

Lee filed a CrR 3.5 motion challenging the admissibility of the statements he made to Trooper Robertson after the car crash. At the Cr.R 3.5 hearing, Lee argued that because he was too injured to leave the scene, he was in custody for *Miranda* purposes. Lee contended that he was in custody when he spoke to Trooper Robertson because his freedom of movement was

3

restricted while medical personnel were tending to him. He also argued that Trooper Robertson did not advise Lee of his *Miranda* rights and that Trooper Robertson should have informed him of his *Miranda* rights after asking "what happened and he was told by Mr. Lee that he had fallen asleep driving because he was working long hours." VRP (Jan. 23, 2018) at 124. Lee did not argue that his statements were involuntary because he was severely injured and intoxicated.

The court ruled that the statements Lee made to Trooper Robertson prior to being placed in the ambulance were admissible, but that the statements made in response to Trooper Robertson's questions about drinking and using drugs when Lee was in the ambulance were not admissible.

B.      BENCH TRIAL

Lee's case was tried to the bench. The trial court found Lee guilty of vehicular homicide for Grice's death.

C.      SENTENCING

At the sentencing hearing, the State asked the court to impose as a condition of community custody no contact with the victim's family. Grice's mother testified about her grief, stating that "I have had to seek grief counseling, Christian counseling. I have been diagnosed with PTSD. I can't sleep more than two hours without having nightmares." VRP (March 16, 2018) at 756. Grice's brother, Scott Johnson-Temores, wrote a letter to the court describing his close relationship with his brother, explaining that he was at the tavern with Lee and Grice before the crash, and stating he was the one who convinced Grice and Lee to stay out longer. Grice's brother-in-law, Brandon Johnson-Temores, also wrote a letter to the court describing his husband's close relationship with Grice, and explaining that he also was present at the tavern with Grice and Lee

4

before the crash. He wrote, "We are forever changed and have to find some way to carry on without Chris." Clerk's Papers (CP) at 125.

The trial court imposed a sentence of 280 months of confinement and 18 months of community custody. The trial court also imposed a criminal filing fee and a DNA collection fee. In the judgment and sentence, the court ordered a community custody condition prohibiting Lee from having contact with Grice's surviving family members.

Lee appeals his conviction and sentence.

## ANALYSIS

A.    ADMISSIBILITY OF LEE'S STATEMENTS

Lee argues that the trial court erred by admitting the statements he made to Trooper Robertson. Lee contends that the statements he made to Trooper Robertson were involuntary and coerced because he was severely injured and intoxicated, and therefore, the trial violated his constitutional rights. Lee raises a challenge to his statements made to Trooper Robertson based on involuntariness and coercion for the first time on appeal.

The general rule is that we will not review issues raised for the first time on appeal. *State v. O'Hara,* 167 Wn.2d 91, 97-98, 217 P.3d 756 (2009); *State v. Williams*, 137 Wn.2d 746, 749, 754, 975 P.2d 963 (1999). But there is an exception to the rule when the claimed error is a "'manifest error affecting a constitutional right.'" *O'Hara,* 167 Wn.2d at 98 (quoting RAP 2.5(a)). "To meet RAP 2.5(a) and raise an error for the first time on appeal, an appellant must demonstrate (1) the error is manifest and (2) the error is truly of constitutional dimension." *Id.* Therefore, in order for us to review an issue raised for the first time on appeal, Lee has the burden of showing that the alleged error was manifest and affected the defendant's constitutional right. *Williams*, 137

Wn.2d at 749. "The fundamental issue . . . is whether the trial court's . . . CrR 3.5(b) [error] . . . is a manifest error affecting a constitutional right." *Id.*

Here, at the CrR 3.5 hearing, Lee argued that he was in custody for the purposes of *Miranda*. He argued that he was subject to custodial interrogation when Trooper Robertson asked questions that were "incriminating in nature, eliciting incriminating responses and the like." VRP (Jan. 23, 2018) at 125. At no time during this hearing or the motion prior, during the trial, or during the sentencing hearing did Lee argue that his statements were not voluntary.

Lee does not expressly argue in either his brief or his reply brief that there was a manifest error of constitutional dimension. However, Lee does argue that Robertson questioned him when he was in a weakened, inebriated state, and therefore, his statements were involuntary under the Fifth Amendment. But Lee fails to show a manifest error affecting a constitutional right.

The Fifth Amendment provides that a defendant shall not "be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. When determining whether a self-incriminating statement was compelled or made voluntarily, courts look to the totality of the circumstances. *State v. Unga,* 165 Wn.2d 95, 100–01, 196 P.3d 645 (2008).

In evaluating the totality of the circumstances, we consider Lee's physical and mental condition, his experience, and the conduct of the police. *State v. Rupe*, 101 Wn.2d 664, 679, 683 P.2d 571 (1984). To be voluntary, a defendant's waiver must be the product of rational intellect and free will. *Id.* When a defendant's will is "simply overborne" by the police officer, due to his physical condition, the statements cannot be used against the defendant at his trial. *Mincey v. Arizona*, 437 U.S. 385, 399, 401-02, 98 S. Ct. 2408 (1978).

Here, Lee appeared coherent to Trooper Robertson and was able to respond to Trooper Robertson's basic questions by giving his name, date of birth, and the fact that he was driving the vehicle from the Eatonville Cutoff. Also, Lee displayed an awareness of the situation by providing a seemingly reasonable explanation for the crash and asking Trooper Robertson to look for another possible occupant in the vehicle who lived on Eatonville Cutoff. And when Lee stated he was having difficulty breathing when asked if he would take a breath test, Trooper Robertson terminated his encounter with Lee. Thus, given the totality of the circumstances, Lee's free will was not overborne by Trooper Robertson. Because Lee has not shown a manifest error, we do not consider his argument for the first time on appeal.

B.     CONSTITUTIONALITY OF COMMUNITY CUSTODY CONDITION

Lee argues that the trial court erred by imposing the community custody condition prohibiting him from having contact with "surviving family members" because the community custody condition is unconstitutionally vague. Br. of App. at 22. He contends that the community custody condition does not inform him of whose family he cannot have contact with, and it does not specify the degree of familial relatedness he is prohibited to have contact with. Additionally, Lee argues that the condition is unconstitutionally overbroad because it fails to limit the degree of familial association and chills his ability to "speak to anyone at all for fear of accidentally violating the prohibition on contact." Br. of App. at 24. We disagree.

1.     Vagueness

Under the due process principles of the Fourth Amendment to the United States Constitution and article I, section 3 of the Washington Constitution, a community custody condition is unconstitutionally vague if it fails to (1) provide ordinary people fair warning of

7

proscribed conduct, and (2) have sufficiently ascertainable standards that are definite enough to protect against arbitrary enforcement. *State v. Wallmuller*, 194 Wn.2d 234, 238-39, 449 P.3d 619 (2019); *State v. Bahl*, 164 Wn.2d 739, 753, 193 P.3d 678 (2008). A community custody condition is unconstitutionally vague if it fails to do either. *Bahl*, 164 Wn.2d at 753.

In deciding whether a term is unconstitutionally vague, the term is not considered in a vacuum; rather, it is considered in the context in which it is used. *The City of Spokane v. Douglass,* 115 Wn.2d 171, 180, 795 P.2d 693 (1990). When a term is not defined, the court may consider the plain and ordinary meaning as set forth in a standard dictionary. *State v. Sullivan,* 143 Wn.2d 162, 184–85, 19 P.3d 1012 (2001); *see also Medina v. Pub. Util. Dist. No. 1 of Benton County,* 147 Wn.2d 303, 315, 53 P.3d 993 (2002). If "persons of ordinary intelligence can understand what the [community custody condition] proscribes, notwithstanding some possible areas of disagreement, the [community custody condition] is sufficiently definite." *Douglass*, 115 Wn.2d at 179.

Here, the trial court prohibited Lee from having contact with "surviving family members." CP at 87. The word "surviving" is defined in the dictionary as, "to remain alive or in existence." WEBSTER'S II NEW COLLEGE DICTIONARY 1110 (1995). The word "family" is defined as "a fundamental social group in society consisting esp. of a man and woman and their offspring." WEBSTER'S II NEW COLLEGE DICTIONARY 404 (1995). *See also* BLACK'S LAW DICTIONARY (11th Ed. 2019) at 747 ("A group consisting of parents and their children.").

Here, only Grice died. Therefore, in the context of this case, it is clear that the condition refers to Grice's family—the discreet group of people consisting of Grice's parents, siblings, spouse, and children who remain alive after Grice's death. A person of ordinary intelligence would

understand the community custody condition based on the context and the plain meaning of the term "surviving family members." Therefore, because the condition is clear, it provides a fair warning of the proscribed conduct and does not depend on a completely subjective standard in enforcement. Thus, we hold that the community custody condition is not unconstitutionally vague.

2. Overbreadth

Lee argues that the condition is unconstitutionally overbroad because it does not limit the familial association, and it does not inform Lee of whose family he cannot contact. Additionally, he argues that it is overbroad because it has a "chilling effect on Lee's ability to speak to anyone at all for fear of accidentally violating the prohibition on contact." Br. of App. at 24.

When considering whether a community custody condition is overbroad, courts focus on whether the condition is crime-related. *See State v. McKee*, 141 Wn. App. 22, 37, 167 P.3d 575 (2007) ("[A]n offender's constitutional rights during community placement are subject to [Sentencing Reform Act of 1981]-authorized infringements, including crime-related prohibitions."), *review denied*, 163 Wn.2d 1049 (2008).

"Conditions on a sentence that impose limitations on a fundamental right must be 'sensitively imposed' so that they are 'reasonably necessary to accomplish the essential needs of the State and public order.'" *State v. Cortes Aguilar*, 176 Wn. App. 264, 277, 308 P.3d 778 (2013) (quoting *State v. Warren*, 165 Wn.2d 17, 32, 195 P.3d 940 (2008)), *review denied*, 179 Wn.2d 1011 (2014). A restriction implicating First Amendment rights demands a greater degree of specificity and must be reasonably necessary to accomplish the essential needs of the state and public order. *State v. Riley,* 121 Wn.2d 22, 37-38, 846 P.2d 1365 (1993) (quoting *Malone v. United States,* 502 F.2d 554, 556 (9th Cir. 1974)), *cert. denied*, 419 U.S. 1124 (1975).

Here, the legislature has determined that courts may prohibit defendants from contacting crime victims and their family. RCW 9.94A.703(3)(b). Because the community custody condition prohibits contact with the Grice's surviving family, the condition is crime-related. Moreover, the community custody condition does not violate Lee's First Amendment rights because it is narrowly tailored to include only Grice's surviving family to allow them to cope with the consequences of the crime.

This is not a circumstance where the defendant and the crime victim were strangers. Rather, the evidence shows that Lee had a relationship with Grice and his family. Lee and Grice were socializing with Grice's family the night the collision occurred. Because of the collision, Grice's family has been emotionally affected. Grice's mother has had to receive grief counseling and has been diagnosed with PTSD. Grice's brother must deal with the grief of having encouraged his brother to stay at the tavern with Lee and is "forever changed and ha[s] to find some way to carry on without [Grice]." CP at 125. Therefore, the community custody condition is sensitively imposed to allow the crime victim's family the opportunity to cope with their grief. As noted above, the plain language of the condition makes it clear what the proscribed activity entails. And "family" is a discreet unit limited to Grice's parents, siblings, spouse, and children. Thus, the condition is narrowly tailored to accomplish an essential need of the State and public order. Therefore, we hold that the community custody condition is not overbroad and does not violate Lee's First Amendment rights.

C.      LFOs

Lee argues that certain legal financial obligations should be stricken because Lee is indigent.  He argues that this court should strike the criminal filing fee and the DNA collection fee. We agree.

Legislative amendments to the LFO statutes in 2018 prohibit sentencing courts from imposing a criminal filing fee on indigent defendants.  RCW 36.18.020(2)(h);; *State v. Ramirez*, 191 Wn.2d 732, 746-747, 426 P.3d 714 (2018).  The legislature also recently amended former RCW 43.43.7541, and as of June 7, 2018, states, in part:

> Every sentence imposed for a crime specified in RCW 43.43.754 must include a fee of one hundred dollars unless the state has previously collected the offender's DNA as a result of a prior conviction.

Our Supreme Court has held that the amendments apply prospectively, and are applicable to cases pending on direct review and not final when the amendment was enacted.  *Ramirez*, 191 Wn.2d at 747.

Here, the State concedes that the imposed criminal filing fee and DNA collection fee should be stricken.  There is no dispute that Lee is indigent and there is some indication that Lee's DNA has previously been collected.  Therefore, we accept the State's concession and remand for the trial court to strike the criminal filing fee and DNA collection fee from Lee's judgment and sentence.

D.      STATEMENT OF ADDITIONAL GROUNDS

Lee argues that all of the statements he made to Trooper Robertson and Deputy Tulloch were involuntary and he was not given his *Miranda* rights; therefore, the trial court erred by

admitting his statements. We hold that Lee was not in custody for purposes of *Miranda* at the time he made the challenged statements.[3]

Both the Fifth Amendment to the United States Constitution and Article I, section 9 of the Washington Constitution protect a person from being compelled to give evidence against himself or herself. *Unga*, 165 Wn.2d at 100-01. "*Miranda* warnings must be given when a suspect endures (1) custodial (2) interrogation (3) by an agent of the State." *State v. Heritage*, 152 Wn.2d 210, 214, 95 P.3d 345 (2004).

The "in custody" determination requires an inquiry into the circumstances surrounding the interrogation and whether a reasonable person would have felt that he was not at liberty to terminate the interrogation and leave. *Thompson v. Keohane*, 516 U.S. 99, 112, 116 S. Ct. 457, 133 L. Ed. 2d 383 (1995); *State v. Templeton*, 148 Wn.2d 193, 208, 59 P.3d 632 (2002). When a person is unable to leave an interrogation due to medical treatment, the question becomes whether he was at liberty to terminate the interrogation and cause the officers to leave. *United States v. Infante*, 701 F.3d 386, 396 (1st Cir. 2012), *cert. denied*, 570 U.S. 911 (2013).

In *Infante*, the court concluded that the circumstances showed that a reasonable person in the defendant's position would have felt free to terminate two interviews and ask the officers to leave. 701 F.3d at 397. The relevant circumstances included the neutral setting of the hospital room as well as the facts that Infante went to the hospital of his own accord, hospital staff came and went freely during the interviews, the number of officers in the room was not overwhelming, the

---

[3] As discussed above, because Lee raises this issue of voluntariness for the first time on appeal and he fails to show a manifest error affecting a constitutional right, we do not address the issue of whether Lee's statements were involuntary. Moreover, the record shows that Deputy Tulloch only asked Lee whether he was in any pain and whether he hurt.

officers did not physically restrain Infante or act in a threatening manner, the interviews were short (26 and 21 minutes), and an officer informed Infante during each interview that he was not under arrest or in custody and did not have to speak with the officers. *Id.* at 397–98. Moreover, "[d]espite having received pain medication, Infante was coherent and responsive, showing no sign of mental impairment." *Id.* at 397.

Similarly, in *State v. Butler*, 165 Wn. App. 820, 828, 269 P.3d 315 (2012), the defendant was restricted to a hospital room by his injuries and not by the police, no officers were stationed inside or outside his room, and the defendant's nurse, rather than law enforcement, ultimately controlled access to him. The court found that the hospitalized defendant was not under custody when he spoke to a detective. *Butler,* 165 Wn. App. at 828. *See also State v. Kelter,* 71 Wn.2d 52, 54-55, 426 P.2d 500 (1967) (defendant was not in custody even though confined to hospital room because he had not been arrested or otherwise restrained by the police).

Here, when Deputy Tulloch arrived at the scene of the accident, Lee was bleeding profusely. Deputy Tulloch applied a tourniquet to his arm to stop the bleeding. While technically, at the time when Deputy Tulloch was applying the tourniquet and talking to Lee, Lee was being held down by a police officer, but Deputy Tulloch was holding Lee down for the purpose of medical treatment. Lee was not in custody.

And when Trooper Robertson arrived, Lee was restricted due to the medical personnel working on his arm, not by the police. Trooper Robertson asked simple questions pursuant to his duties to investigate the collision. Like in *Infante*, in which the defendant was free to terminate the questioning, the facts here indicate that Lee did have the power to terminate the questioning. Trooper Robertson testified that Lee appeared coherent and he was able to answer the questions

posed by Trooper Robertson showing that he displayed sufficient coherency to terminate the interrogation if he desired. And when Lee said he was having trouble breathing in response to Trooper Robertson's question as to whether Lee would take a breath test, Trooper Robertson terminated the encounter. Because Lee was only restrained for medical purposes and not by the police and the record shows that he was able to terminate the questioning, we hold that Lee was not in custody for purposes of *Miranda* at the time he made the challenged statements.

## CONCLUSION

We affirm Lee's conviction and challenged community custody condition, but we remand with instructions to strike the criminal filing fee and DNA collection fee from Lee's judgment and sentence.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____, A.C.J.
Lee, A.C.J.

I concur:

_____
Worswick, J.

CRUSER, J. (concurring) — I concur with the result reached by the majority. I write separately, however, because I disagree with the majority's analysis of Lee's claim that his statements to the police were involuntary. Lee makes no attempt to show that his claim of error warrants review for the first time on appeal. He simply ignores RAP 2.5(a). In spite of this deficiency, the majority nevertheless analyzes the claim to determine whether the alleged error is manifest based on the record from the CrR 3.5 hearing.

At the CrR 3.5 hearing below, Lee argued only that he was in custody at the time he made his statements to Trooper Robertson and that he was not timely provided with *Miranda*[4] warnings. As such, the record was not developed with a view toward whether Lee's statements were involuntary. Had this claim been preserved, the State could have, and likely would have, asked different or additional questions of its witnesses at the hearing. The State also might have produced additional witnesses. More importantly, the trial court would have had the opportunity to consider and rule upon this claim.

The admissibility of statements under CrR 3.5 is both a legal and a factual question, and we are not permitted to find facts. Questions about the admissibility of a defendant's statements, as well as questions about whether evidence should be suppressed under CrR 3.6, should not be brought for the first time in a direct appeal. Unlike a trial court error that can be analyzed on the existing trial record, and thus may be reviewed for the first time in a direct appeal, suppression

---

[4] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

claims require specific development at an evidentiary hearing below. And the trial court, as the fact finder, must have an opportunity to review the claim.[5]

To obtain review of an unpreserved error under RAP 2.5(a), an appellant must show that (1) the error is manifest and (2) the error is of constitutional magnitude. *State v. O'Hara*, 167 Wn.2d 91, 98, 217 P.3d 756 (2009). In order to demonstrate that the alleged error is manifest, the appellant must show that the error had practical and identifiable consequences in the trial below. *State v. Bertrand*, 165 Wn. App. 393, 400, 267 P.3d 511 (2011). In *Bertrand*, we found the appellant had not met her burden of demonstrating manifest error where "she neither argue[d] nor show[ed]" that the alleged error was manifest, and she thus failed to show that the alleged error had practical and identifiable consequences at trial. *Id.* (citing *State v. Grimes*, 165 Wn. App. 172, 190, 267 P.23d 454 (2011)). Likewise, here, Lee has not argued or even attempted to show that this claim of error had practical and identifiable consequences at trial.

Although I agree with the majority's ultimate conclusion that review of this claim for the first time on appeal is not warranted, I disagree with the approach taken by the majority in reaching that result. The majority explores the limited record before us to determine whether the claim has factual support, such that the alleged error might be found manifest, which is inappropriate where

---

[5] I am not suggesting that unpreserved CrR 3.5 or CrR 3.6 claims can never be reviewed by an appellate court. Rather, the proper way to raise such a claim is in a personal restraint petition. If a petitioner makes a prima facie showing of error, this court can order a reference hearing in which the trial court can find facts and consider the claim. A reference hearing is appropriate where a personal restraint petitioner makes the required prima facie showing of error "but the merits of the contentions cannot be determined solely on the record." *In re Pers. Restraint of Yates*, 177 Wn.2d 1, 18, 296 P.3d 872 (2013) (quoting *State v. Hews*, 99 Wn.2d 80, 88, 660 P.2d 263 (1983)); *see also* RAP 16.11(b).

No. 51633-1-II

the record below is factually inadequate to consider this claim.  In my view, the majority should have declined to go that far.

I concur with the result reached by the majority in this case.

CRUSER, J.