Filed 6/20/24  P. v. Soto CA2/6

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ELIDE ANDREA SOTO,<br><br>    Defendant and Appellant. | 2d Crim. No. B323325<br>(Super. Ct. No. 2016028701)<br>(Ventura County) |

Elide Andrea Soto appeals a judgment following her conviction of child endangerment (Pen. Code, § 273a, subd. (a))[1]; with jury findings that she inflicted great bodily injury on her child (§ 12022.7, subd. (d)); and the crime involved great violence and great bodily harm disclosing a high degree of cruelty, viciousness, and callousness against a particularly vulnerable victim.  (Cal. Rules of Court, rule 4.421(a)(1), (3).)  The trial court sentenced her to an aggregate prison term of 10 years.  We

---

[1] All statutory references are to the Penal Code unless otherwise stated.

conclude, among other things, that 1) the court did not err by denying her "motion to suppress" her statements to police; 2) the court did not err by instructing the jury with CALCRIM No. 3250; but 3) in light of the requirements of section 1170, subdivision (b)(6), we must remand for resentencing. In all other respects, we affirm.

FACTS

Soto, the mother of J., a four-month-old boy, was the "primary caregiver." One morning Soto told her sister that she needed to take the baby to the hospital because he would not stop crying.

Soto took the baby to St. John's Regional Medical Center twice. On the second visit the medical staff determined that the baby was having seizures.

Soto and the baby were transported by ambulance to Children's Hospital in Los Angeles. Philip Stanley, a pediatric radiologist at Children's Hospital, reviewed x-rays of the baby's injuries. He determined the baby had a recent skull fracture, rib fractures, a hand injury, a healing fracture of the knee, a tibia fracture consistent with someone having shaken the baby, and a left ankle fracture. He determined these injuries are "indicative" of "nonaccidental trauma."

Eugenia Ho, a pediatrician neurocritical care physician at Children's Hospital, treated J. for seizures. Soto told her that the baby suffered injuries in a fall. Ho determined the baby had an "acute brain injury." That injury caused the seizures. Ho testified the baby also had "fractures within the body" and "retinal hemorrhages." These injuries were the result of "nonaccidental trauma."

The police received a report that there was a baby at Children's Hospital with a "suspicious" head injury.

Police Officers Juanita Suarez and Terrance Dobrosky arrived at the hospital with another officer. Dobrosky testified Soto was not a suspect and she agreed to speak with them. Soto, the primary caretaker of the baby, said a one-year-old child used her foot to push the baby so the baby's "bouncer" tipped over causing the baby to strike his head on a TV stand. Soto's 14-year-old sister was in the room at that time. Soto gave permission for the police to see the bouncer.

Suarez testified that Soto's description of how the baby was injured did not match the severity of the baby's injuries. During the interview, Suarez asked Soto whether she made a mistake, whether she intended to hurt the baby, or whether she intended to kill the baby. Soto agreed to meet the police officers at her home the next day. She was not placed under arrest. In a voicemail to police, Soto admitted that she did not tell the truth. She said her sister was not present during the incident, and she had eaten brownies laced with marijuana.

During the police interview, Soto did a reenactment to show how the baby was injured using a doll. She told police that she "shook" the baby twice and "tossed" him on the bed; his head "went off to the side." She also "squeezed" him "pretty hard." The police videotaped the interview. A transcript of it was also admitted into evidence. The trial court denied Soto's motion to suppress that evidence.

Janet Arnold-Clark, a pediatrician specializing in child abuse, testified the baby had "brain damage." The baby had a "subdural hematoma" that was the result of "trauma." There was injury to the back of his neck which indicates "shaking." There

3

was a skull fracture and "retinal hemorrhages" consistent with shaking. The injuries are not consistent with a "one-time accident." They were the result of "nonaccidental trauma."

Mark Borchert, a pediatric neuro ophthalmologist, testified the baby had multiple retinal hemorrhages. These were "consistent with nonaccidental trauma."

In the defense case Soto testified at the time she was pregnant with J., she had two other children. J. was not a planned child. She had considered getting an abortion. At the time J. was taken to the hospital, she was 21 years old. J. was a premature baby. The police interview at the hospital lasted two and one-half hours. She was surprised when the police said J. had rib and leg injuries. Officer Suarez said if the injuries were "unexplained," there "would be a problem." She felt compelled to provide explanations for the injuries to the police.

Soto testified the reenactment in the video admitted into evidence showing how she used the doll to explain what happened to the baby was not accurate. The police told her what the injuries were. She did not squeeze the baby hard, shake him, or throw him. She provided explanations to the police "out of fear for [her]self" and "[her] children." All the reenactments she made for the police were not accurate.

Susan Gootnick, a radiologist, testified for the defense and said that J. was a premature baby who was "low in calcium." Low calcium can cause seizures. She said J.'s injuries were due to "weak bones secondary to poor vitamin D intake and low calcium." On cross-examination, she said she was not board certified in "pediatric radiology," any "pediatric medicine" or in "child abuse pediatrics." She did not ever see or treat the baby.

4

## DISCUSSION

### *Admitting Soto's Statements to Police*

Soto contends her statements to police were coerced and given without a *Miranda* warning. (*Miranda v. Arizona* (1966) 384 U.S. 436.) She contends the trial court erred by denying her motion to suppress evidence and by admitting those statements at trial.

Soto filed a motion to suppress statements she made to police in an interview at the hospital and a second interview at her home. During questioning, Soto performed a reenactment about how the baby was injured using a doll. She told police, among other things, that she "shook" the baby twice and "tossed" him on the bed, and his head "went off to the side." She said she "squeezed" him "pretty hard." She admitted that she initially lied to police about how the baby was injured. This evidence was admitted at trial with a transcript of the police interview and with video evidence. Soto was not given a *Miranda* warning before making her statements to police.

Before police conduct an in-custody interrogation of suspects, they must first advise them of their right to remain silent, their right to counsel, and obtain a waiver of those rights before any statements may be used against them. (*Miranda v. Arizona*, *supra*, 384 U.S. at pp. 469, 471.)

A defendant may move to suppress statements given to police in violation of these constitutional rights. "The primary issue is whether defendant was 'taken into custody or otherwise deprived of his freedom of action in any significant way.'" (*People v. Aguilera* (1996) 51 Cal.App.4th 1151, 1161.)

The trial court deciding a suppression motion must ask "would a reasonable person in the suspect's position during the

5

interrogation experience a restraint on his or her freedom of movement to the degree normally associated with a formal arrest." (*People v. Aguilera*, *supra*, 51 Cal.App.4th at p. 1161.) Courts consider a number of factors to decide whether a custodial type of interrogation occurred. These include, among other things, whether the suspect voluntarily agreed to the interview, where it took place, whether police informed them they were under arrest or in custody, whether there were restraints, or restrictions on the suspect's movement, "whether the police were aggressive, confrontational, and/or accusatory; whether the police used interrogation techniques to pressure the suspect; and whether the person was arrested at the end of the interrogation." (*Id*. at p. 1162.)

"On appeal, we accept the trial court's findings of historical fact if supported by substantial evidence but independently determine whether the interrogation was 'custodial' " (*People v. Aguilera, supra*, 51 Cal.App.4th at p. 1161.)

The trial court denied Soto's motion. It found that "there was no formal arrest throughout the interviews" and that Soto agreed to speak with police. The interview at the hospital was "not in a police dominated atmosphere." Police did not restrict Soto's "freedom of movement." Soto did not ask to leave. The officers wanted an explanation for the baby's injuries. They did not say they had evidence "to prove the defendant was culpable." Most of the interviews were "conducted in a friendly tone" and the officers were "courteous." There was no "formal arrest" and no "de facto arrest." The police were not required to give *Miranda* warnings because Soto was not in custody. Soto's statements were voluntary. There was no police "coercion"; they merely were trying to find out how the baby was injured.

6

Soto has not shown the trial court erred in making these findings. Two police officers testified and the court found them to be credible. Their testimony supports the findings that the police did not engage in coercive conduct.

Officer Suarez testified that she and two other officers went to the hospital. Soto agreed to speak with them. She was not under arrest. The purpose of the interview was to obtain information about the baby's history. Suarez had "no suspects" in mind during that interview and she did not restrict Soto's "liberty." Soto was not handcuffed and the officers did not "flash" their weapons.

Officer Dobrosky testified they went to the hospital because the baby had a suspicious head injury. Soto was not a suspect. She agreed to speak with them. She was not under arrest, not handcuffed, and the police did not draw any weapons. The interview was "informal" or "low key," and Dobrosky made no promises to her and made no threats. During one point Soto said she was reluctant to provide "certain information" because of her immigration status. But Dobrosky assured her that he was not concerned with her immigration status. The interview at the hospital lasted two and a half hours, but the first half of that interview was used to only obtain biographical and medical history information.

Soto was not arrested at the end of these interviews and the hospital and home interviews were not the equivalent of an in custodial jail interrogation. (*California v. Beheler* (1983) 463 U.S. 1121, 1125; *People v. Linton* (2013) 56 Cal.4th 1146, 1167 [police investigatory questions of defendant at his home was not an in custodial interrogation]; *United States v. Infante* (1st Cir. 2012) 701 F.3d 386, 397 [hospital was a "neutral setting" and police

7

questioning a suspect there was "non-custodial"]; *United States v. Martin* (9th Cir. 1985) 781 F.2d 671, 673 [police interview of a suspect at a hospital was not a custodial setting requiring a *Miranda* warning].)  Soto described what she did to the baby in a recorded interview with Suarez.  Dobrosky testified Soto "voluntarily provided" that "reenactment."  The transcript of that interview shows Suarez asked questions.  She did not make threats or promises, she did not claim Soto committed any crimes, and she did not threaten to arrest Soto.

Soto suggests Suarez coerced her to incriminate herself by suggesting she was a "baby killer."  But Suarez testified she wanted to know from Soto where she fell within a "large scale" of categories of conduct.  Suarez knew the baby was injured and Soto was the caretaker.  Soto had voluntarily described how the baby was injured by another child, but her description did not match the severity of the baby's injuries.  Suarez asked if Soto *made a mistake* and whether Soto intended to hurt the baby.  She asked, "[A]re you [a] baby killer?"  Suarez was not wearing a police uniform, and she testified at the suppression hearing that she made no "reference to [Soto] being charged as a baby killer." At the suppression hearing, Dobrosky testified the officers did not block Soto's path to the hospital door and Soto admitted that none of the officers told her she was not free to leave.  The prosecutor claimed the term "baby killer" in this context was not an accusation; it was merely one open-ended question in a combination of three.

Suarez's request for an explanation for the child's injuries did not render Soto's subsequent statements to be involuntary. (*People v. Holloway* (2004) 33 Cal.4th 96, 121.)  Her questions were "not so accusatory or definitive as to convey *a threat of*

8

*arrest if* [Soto] *declined to give a statement.*"  (*Ibid.*, italics added.)
The officers gave Soto an "opportunity to explain" what happened
to the baby.  (*People v. Perez* (1967) 65 Cal.2d 709, 716.)  Even if
police believed Soto was a possible suspect after her unconvincing
description of how the baby was injured by another small child,
the result would not change.

  *Miranda* warnings are not required simply because " 'the
questioned person is one whom the police suspect.' "  (*California
v. Beheler*, *supra*, 463 U.S. at p. 1125; *People v. Stansbury* (1995)
9 Cal.4th 824, 833-834.)  Police investigatory questioning
"designed to bring out the person's explanation or lack of
explanation of the circumstances which aroused the suspicion of
the police" (*People v. Milham* (1984) 159 Cal.App.3d 487, 500), or
to "explain" what happened (*People v. Perez*, *supra*, 65 Cal.2d at
p. 716), are not improper.  In *People v. Salinas* (1982) 131
Cal.App.3d 925, 936, the court held a police officer properly
detained a defendant suspected of child abuse and properly asked
investigatory, non-accusatory questions about the child's injuries
without giving *Miranda* warnings.  Here Suarez asked
investigatory questions to determine how the baby was injured.

  The question – "[A]re you [a] baby killer?" – did not
transform the interview into a custodial interrogation.  (*People v.
Moore* (2011) 51 Cal.4th 386, 402.)  In *Moore*, during an
interview, the police asked the suspect, "Did you burglarize the
house?" (*Ibid.*)  Our Supreme Court said, "[P]olice expressions of
suspicion, with no other evidence of a restraint on the person's
freedom of movement, are not necessarily sufficient to convert
voluntary presence at an interview into custody." (*Ibid.*)  In
*People v. Potter* (2021) 66 Cal.App.5th 528, 541, the court held a
defendant was not subject to a custodial interrogation even

9

though during an interview police indicated that he "was suspected of having molested his daughter."

In *Oregon v. Mathiason* (1977) 429 U.S. 492, 493-495, the United States Supreme Court held a defendant who agreed to be interviewed at a police station was not subject to a custodial interrogation simply because police told him that they suspected him of a burglary and falsely said defendant's fingerprints were found at the scene. The defendant confessed. The court held a *Miranda* warning was not required because the defendant's "freedom to depart" was not restricted. (*Id.* at p. 495.)

Suarez's questions did not rise to the level of the much more aggressive police questioning that was upheld in *Mathiason*. "Even a clear statement from an officer that the person under interrogation is a prime suspect is not, in itself, dispositive of the custody issue . . . ." (*Stansbury v. California* (1994) 511 U.S. 318, 325.) Consequently, Soto is not entitled to a reversal simply because of the "baby killer" remark. Our Supreme Court has disapproved all cases that have held "an officer's subjective focus of suspicion is *an independently relevant factor* in establishing custody for the purposes of *Miranda*." (*People v. Stansbury*, *supra*, 9 Cal.4th at p. 830, fn. 1, italics added.)

Moreover, even if the phrase "baby killer" could be deemed problematic, "[n]o one factor is dispositive. We look at the interplay and combined effect of all the circumstances to determine whether on balance they created a coercive atmosphere such that a reasonable person would have experienced a restraint tantamount to an arrest." (*People v. Aguilera*, *supra*, 51 Cal.App.4th at p. 1162.) Given that standard, we conclude the trial court did not err.

*The Jury Instruction*

Soto claims the trial court erred by giving CALCRIM No. 3250 to the jury. It involves special allegations on the child endangerment count. She also claims the instruction lacked a required unanimity requirement for the jury.

The trial court instructed jurors stating, "If you find the defendant guilty of child endangerment, you must then decide whether the People have proved special allegations 1, 2, and 3. To prove these allegations, the People must prove that: 1. The defendant personally inflicted great bodily injury upon the person of [J.], age 4 months, a child under the age of 5 years. 2. The crime involved great violence, threat of great bodily injury, or other acts disclosing a high degree of cruelty, viciousness, or callousness. 3. The victim was vulnerable. The People have the burden of proving each allegation beyond a reasonable doubt. If the People have not met this burden, you must find that the allegation has not been proved."

The jury found these allegations to be true.

The People claim Soto's objections to CALCRIM No. 3250 are forfeited. This instruction is based on California Rules of Court, rule 4.421(a)(1). Soto's appellate counsel objects to this instruction. But at trial her counsel agreed to this instruction, and counsel did not request any supplemental or modifying language or an added unanimity instruction. The People's claim that the objections have been forfeited is meritorious. A defendant "is not entitled to remain mute at trial and scream foul on appeal for the court's failure to expand, modify, and refine standardized jury instructions." (*People v. Daya* (1994) 29 Cal.App.4th 697, 714.)

11

But, even on the merits, the result will not change. A unanimity instruction was not required. A unanimity instruction protects a defendant from being convicted of two charged offenses based on less than unanimous verdicts. Soto was not charged with two offenses, only one. The three aggravating circumstances findings were not charged offenses. They were only factors in how the single charged offense – child endangerment – was committed.

"The key to deciding whether to give the unanimity instruction lies in considering its purpose. The jury must agree on a 'particular crime' [citation]; it would be unacceptable if some jurors believed the defendant guilty of one crime and other jurors believed her guilty of another." (*People v. Russo* (2001) 25 Cal.4th 1124, 1134-1135.) "But unanimity as to exactly how the crime was committed is not required." (*Id*. at p. 1135.) It is not needed " 'where multiple theories or acts may form the basis of a guilty verdict on one discrete criminal event.' " (*Ibid*.) Moreover, even had there been instructional error, it would be harmless based on the People's compelling evidence of guilt. (*People v. Wims* (1995) 10 Cal.4th 293, 314-315.)

The People presented other compelling evidence of guilt. (*People v. Cunningham* (2001) 25 Cal.4th 926, 994.) Doctor Arnold-Clark's testimony shows that the baby's injuries were the result of "nonaccidental trauma." They could not be caused by a one-time accident. Doctors Borchert, Ho and Stanley also testified the baby's various injuries were caused by nonaccidental trauma. Ho and Stanley were treating doctors at the Children's Hospital. Defense expert Doctor Gootnick was not a treating doctor. The jury could find she was largely impeached on cross-

12

examinations regarding her qualifications to testify in a child abuse case.  The jury did not find Soto's testimony to be credible.

*Sentencing*

Soto claims the trial court erred by imposing the midterm of four years for the child endangerment count and the high term of six years for the great bodily injury enhancement.

The trial court may impose a six-year high term based on "circumstances in aggravation" where those circumstances have been found "true beyond a reasonable doubt at trial by the jury." (§ 1170, subd. (b)(2).)  Here the court found circumstances in aggravation.  It said, the child "was vulnerable" and "the crime involved great bodily injury disclosing a high degree of cruelty, viciousness or callousness."  Both of those findings were found true by the jury.

But, as the parties note, the Legislature amended section 1170 by adding subdivision (b)(6).  It provides, "Notwithstanding paragraph (1), and unless the court finds that the aggravating circumstances *outweigh the mitigating circumstances* that imposition of the lower term would be *contrary to the interests of justice*, the court shall order imposition of *the lower term* if any of the following was a contributing factor in the commission of the offense: [¶] . . . [¶] (B) The person is a youth or was a youth as defined under subdivision (b) of Section 1016.7 at the time of the commission of the offense."  (§ 1170, subd. (b)(6)(B), italics added.)

Soto was 21 years old at the time of the commission of the offense.  She consequently was "under 26 years of age," and she therefore falls within section 1170, subdivision (b)(6)(B) as a "youth."  (§ 1016.7, subd. (b).)

13

The trial court did not make the findings required by section 1170, subdivision (b)(6). The People argue a remand is not necessary because we may presume the lower court would have found Soto's youth was not a contributing factor in the crime.

But our Supreme court has recently rejected that claim. (*People v. Salazar* (2023) 15 Cal.5th 416, 424, 429.) Appellate courts should not "speculate" that the trial court must have impliedly made an essential, but omitted, sentencing finding. (*Id.* at p. 429.) A remand is required. (*Ibid.*)

DISPOSITION

We remand for resentencing with instructions that the trial court make the findings required by section 1170, subdivision (b)(6). We make no suggestion as to how the court should rule. In all other respects, we affirm.

NOT TO BE PUBLISHED.

GILBERT, P. J.

We concur:

YEGAN, J.

BALDODANO, J.

14

Michele M. Castillo, Judge

Superior Court County of Ventura

_____

Barhoma Law and Matthew Barhoma for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven D. Matthews and Rama R. Maline, Deputy Attorneys General, for Plaintiff and Respondent.